INTER-ISLAND STEAM NAVIGATION COMPANY, LIMITED, *v.* THE AMERICAN SCHOONER "HALCYON."

December 16, 1915.

1. *Salvage:* A salving vessel having towed a vessel in a dangerous position to a supposedly safe place, would lose all claims to remuneration, should it neglect to attempt to save it a second time, when the salved vessel is carried by the same tempestuous weather into a new danger.

2. *Same—Danger to salving vessel:* Remuneration to a salving vessel is enhanced through its being exposed to loss in the salvage operations.

3. *Same—Lesser danger to cargo of libellee than to libellee itself in case of non-salvage affecting decree:* In case the libellee has not been salved but had become a total wreck upon a sand beach on the occasion of her second peril, the fair possibility that a good proportion of her cargo of lumber might be saved at some expense justifies a lesser proportionate decree against the cargo than against the vessel.

*In Admiralty:* Libel *in rem* for salvage.

*L. J. Warren (Smith, Warren, Hemenway & Sutton* with him) for libelant.

*J. W. Russell* for libellee.

Dole, J.  In these proceedings for salvage, the undisputed story is as follows:

The libellee had arrived in the port of Hilo, with a load of lumber, and had begun to discharge her deck-load at the railroad wharf.   On the night of the 12th and 13th of January, 1914, as she was lying a little way off the wharf, moored both to the wharf and to buoys on the port side, a heavy wind came up from the north and caused her to drift, breaking a line attached to the buoy and colliding with a smaller schooner moored near her stern.   Either by blue lights or communication by boat with the steamer Niihau, belonging to the libelant, she suggested assistance. The steamer immediately raised her anchor and came down the wind, near the libellee, and anchored and sent a tow line by boat to the libellee, which then had drifted close to the shore, near the mouth of the Wailoa River, the shore on the east side of the mouth of that river being rocky and that on the west being sandy.   The line was connected and the Niihau towed the libellee out of this dangerous position to a place out in the bay, beyond the end of the railroad wharf; whereupon the tow line broke and the libellee, which had already lost one anchor, dropped the other anchor, the Niihau also anchoring.

In a few minutes it was evident to the master of the Niihau that the libellee was drifting again, this time toward the sandy shore on the west side of the entrance to the Wailoa River.   As she approached this shore the Niihau changed her position and came close to her, reaching a position a little way to the windward.   The master of the schooner, finding himself near to the breakers and still drifting, raised a signal for assistance, and about this time a boat with a tow line left the Niihau and came down the wind on a surf line from the steamer, and upon reaching her delivered the end of the tow line, which the crew of the libellee fastened to her bow; the boat then returning to the steamer and bringing another and larger line which was

also fastened to the libellee. The libellee was then pulled out of this dangerous position to a safe place in the harbor, where she anchored, and, her one anchor having proved insufficient, the Niihau held on to her during the rest of that day and the succeeding night with a line.

There was apparent effort on the part of the libellee to show that she was in no special danger on either occasion and that the master of the steamer Niihau was not prompt in rendering assistance on the second occasion of relief. I am convinced from the evidence that on both occasions the schooner was in great danger of going ashore and of becoming a total loss if she had gone ashore. The wind was blowing a gale, variously estimated from twenty-five to forty miles an hour, the weight and character of the testimany favoring the latter speed. The first aid given was in the darkness of the night, the circumstances creating some danger to the salving steamer, in that she had to proceed between the railroad wharf and unlighted buoys one hundred and fifty to two hundred feet away from the wharf, and anchor and send out her tow line and proceed into the bay with the libellee in tow. The manoeuver was successfully accomplished, yet the tow line parted after the libellee had reached a comparatively safe place; and there is considerable evidence that the parting of the tow line was caused by friction with one of the afore-mentioned buoys. After the line was attached to the libellee, the Niihau sent a boat to sound alongside of the libellee, on her port side, where they found the depth of the water to be eighteen feet amidship and twelve feet near the stern, showing the libellee to be almost ashore.

The evidence of the captain of the Niihau and the members of his crew shows that as soon as those on board noticed that the libellee was drifting again, after her first relief, they immediately began preparations for assisting her, pulling up anchors and proceeding toward the drifting schooner and dropping anchors and letting out

chain until the steamer had reached a favorable position for assisting the schooner, getting out a tow line, coiling it in the boat, and then sending the boat down the wind on a surf line, with a tow line for delivery to the schooner. The evidence of the captain and members of his crew that this boat left the steamer before the signals had been raised by the schooner for relief was positive, it appearing from their testimony that the signals for relief were raised while the boat was on the way and had nearly arrived at the schooner.

A point was made by libellee's counsel that as, according to the evidence, about two hours elapsed between the time of the breaking of the tow line at the first relief and the delivery of the end of the tow line to the schooner on the occasion of the second relief, the Niihau must have been doing nothing during a part of this time—had perhaps waited for signals of distress before moving. The fact as shown by the testimony of libellee's witnesses, that the boat from the steamer, carrying the tow line, started almost immediately after the signals were raised, shows conclusively that the steamer was thoroughly prepared to act and had been engaged for some part of the two hours in making preparations. We have to consider that when her master noticed the schooner was drifting, fifteen or twenty minutes after the tow line parted, he had to raise his anchors and steam out to the place where he anchored the second time, finding the right position and dropping both anchors, letting out the chain to an extent which would bring him in a favorable position for assisting the schooner, all of which, according to the testimony, took from twenty minutes to half an hour. He then prepared his boat for conveying the tow line to the schooner, coiling the tow line of a six-inch size in the boat, fastening that to a four-inch line for giving it sufficient length for handling, and sending the boat in by a surf line to the ship, negotiating with his boat's crew, who demurred to going without such surf line.

Such preparation might well have occupied an hour and a half, or more; and the testimony in regard to the time elapsed is of such a general character, merely approximating two hours, that, as a basis for inexcusable delay, it does not appeal to me as being very substantial.

The case presents itself to my mind as one of the most satisfactory cases of salvage on the part of the salvors that has appeared in this court. The agents of the libelant, upon being informed of the danger of the libellee, promptly came to her assistance in the darkness of the night, under circumstances of some danger to its steamer, and removed her from her dangerous position to a safe one in the harbor, or which would have been a safe one if the libellee had been equipped with her two anchors. As soon as the agents of the libelant noticed that the libellee was drifting again they began preparations for her relief, and continued such preparations until they were ready to send her a tow line the second time, at which time the libellee was in a dangerous position and, without the relief which was given her, was in prospect of becoming a total loss.

[1] I cannot find from the testimony that there was any neglect or inexcusable delay on the part of the libelant's agents. Having once salved the schooner, they understood, or should have understood, that any neglect by which she might have been lost the second time would lose them all claims for remuneration for her first salvage, unless it should absolutely appear that the second danger and final loss was caused solely by the fault of the libellee. The salving methods were the best, and were carried out with skill and courage and resulted in the entire deliverance of the libellee.

[2] In all these operations, there was, according to the evidence, considerable danger to the salving steamer, from the possibility of entangling her propeller with tow lines, in which case she would be helpless if her anchors should

fail to hold from any cause, whether from dragging or the parting of the anchor chains.

[3] There was considerable testimony as to the danger to the cargo in case the schooner had gone ashore and had become a loss. As the weather began to diminish in severity during the following night after the salvage, after a period of perhaps twelve hours or so, it is hard for the court to say from the testimony what the situation of the lumber would have been if the schooner had been wrecked. The evidence in the case shows that the schooner was old and in a weak condition from age and decay. It is uncertain that the ship would have been so broken up that the lumber would have escaped into the waves, and yet that might have happened. In any case, the danger to the cargo was considerable. If the ship had gone ashore and held together until the storm subsided, twenty-four hours or more afterwards, the removal of the cargo from the hull to the shore would have been attended with very considerable expense.

In view of the circumstances, as shown by the evidence, that the ship was in the greatest danger and was, to my mind, rescued from total loss, and that the danger to her cargo was considerably less, I think a decree awarding libelant one-half of the value of the schooner, the whole value of which has been admitted to be $1,500; and one-third of the value of the cargo, which has been admitted to be $6,381.85, would be reasonable. A decree may be entered for $750, as one-half of the value of the vessel, and $2,127.28, as one-third of the value of the cargo, totalling $2,877.28; all costs to be paid by the libellee.